Our next case this morning is Park Pet Shop v. City of Chicago Mr. Patrick Good morning, Your Honor. May it please the Court. My name is Sean Patrick. I'm here on behalf of Appellant's Plaintiffs, Park Pet Shop, et al. v. City of Chicago, et al. This is a case where the City of Chicago enacted an ordinance that prevented local retailers from selling pets, dogs, cats, and rabbits, selling them if they were bought from a breeder. And it allowed them to source these pets, that I'll refer to, dogs, cats, and rabbits, from kennels, adoption services, government adoption services, secondary sources. The effect of this ordinance is that it bans all foreign breeders from participating in the local Chicago marketplace. The City refers to the ban as a puppy mill ban. That only encapsulates part of the law. The law prevents both puppy mills and small breeders or ethical breeders that are outside the City of Chicago from participating because the only way that a foreign breeder can participate in the market is by using a retailer. That is how all of them do it. The law, however, allows local breeders to participate within the City limits. Selling directly. Selling directly. And the same is true of out-of-state breeders. There really is no discrimination here. Everybody is subject to the same rule. There's a discriminatory effect, and that is, yes, they can sell on the Internet to people within the City. But just like a few other cases that we've seen, Dean Milk restricted it to five miles outside of the City. It must be. Dean Milk had a specific geographic restriction. We don't have that here. We can agree that this is not facially discriminatory, can't we? I can agree to that. Okay, that's helpful. And can we agree that it does not have extraterritorial regulatory effect? That is, Chicago is not trying to regulate the conduct of parties outside Chicago. Correct. Okay. So your case then becomes one of these, frankly, rather mushy Commerce Clause challenges based on burdensome effects and trying to weigh incommensurate costs and benefits. Well, I mean, the effect, Your Honor, is that Cedar Woods Farm was able to, until this law was passed, is able to sell within the City. Let's talk, if we could, for a minute about, let's say, Exxon against Maryland, where the court was pretty specific. As you may recall in that case, Maryland passed legislation saying that refiners and producers of petroleum products could not own or control retail outlets. And, in fact, its application was only to out-of-state owners. There weren't any in-state producers and refiners in Maryland. And the Supreme Court said that was okay because the Commerce Clause does not protect particular channels or modes of distribution. And it's possible to see this case as being fairly similar, isn't it? There's some similarity. However, the City had least discriminatory or less discriminatory methods to achieve the same goal. Well, that may or may not be relevant, right? I mean, the same could have been said in Exxon against Maryland. I know there are some cases that talk about less discriminatory alternatives, but here we don't have it. This isn't discrimination. One of the differences is that oil producers could still have their products sold within. It seems to me that any disadvantage to out-of-state breeders is created by distance and not state lines. I mean, in other words, breeders who are located in Whiting, Indiana or Kenosha, Wisconsin, are far more likely to get business from Chicago residents than breeders in, say, Springfield or Carbondale, Illinois, you know, or Marion. So it's not really a distinction based on state lines so much as it is distance. Would you agree with that? I would agree that it affects both downstate Illinois breeders as well as out-of-state breeders. However, there's still a hindrance on interstate commerce that's effectuated by this law. Courts have likened it to... And I heard that the city or other government entities also prohibit the sale of many exotic pets, you know, lion, cubs, wolves, snakes, I don't know. If the city deems overbred dogs to be a health and safety issue or a consumer protection issue, isn't that the same sort of regulatory issue? I would say that's distinguished by the fact that local breeders can still operate business as usual while foreign breeders cannot. And also distinguished from Exxon is that I believe, and I can present a supplemental brief to this effect if you wish, that in Maryland the foreign oil producers could still sell their products in Maryland, but here they can't. There's no way for Cedar Woods Farm to sell their pets here in Chicago. However, there is a way for local breeders to do so, and that's the discriminatory effect that we argue in this case. What do you mean there's no way? There's no way for them to sell within the city. They can sell directly, just like local breeders can sell directly. There isn't any discriminatory burden. But what I'm saying is that in Maryland they could still sell their products on the premises. But not through the preferred channels. But still through a channel. In this case, they can't sell through any channel. Well, sure they can. They can sell over the Internet. But not within the premises. They can sell over the Internet to Chicago patrons or consumers. A hundred percent. What I'm saying is that in Maryland they could sell over the Internet or they could sell through a retailer. However, they didn't own that retailer, but they still could sell through a retailer. They can't sell on the premises of Chicago. Neither can local breeders sell at a pet store in Chicago. However, people can come to their store or house and still buy a dog from a local breeder. They can't do that for an out-of-state breeder. Right. Well, this gets back to Judge Rovner's question about the effect that you're focusing on is a function of distance only,  Well, it puts a hindrance on interstate commerce. And the effect of the toll effect of the law is one to reduce that. Your theory is that if something is inconvenient to out-of-state businesses, it's unconstitutional. Is that right? No. There could be inconveniences. So what's the standard? Well, the standard, if we're not at the four, in national paint, there's four different categories of discrimination. For example, if we're not in attention We don't have discrimination. Or four different categories of You're talking about just burdensome effects. Burdensome effects on interstate commerce. If we're in an incidental effect on interstate commerce, we would be under the third category, which would be the pike balancing test. And so does this, do these restrictions outweigh the punitive local benefits? I would argue that the state has or the city has not been able to show any punitive local benefits. Well, wait a second. Look, let me put it this way, and I'll be interested to hear what the government has to say about this as well. If we were to reverse any of this, I'm not sure we would be doing you any favors, okay? Because it's a 12B, what concerns me most is that this was a 12B6 dismissal. And if you've got a case, it's based on this sort of mushy branch of dormant commerce clause cases, where courts try to weigh burdens on, incidental burdens on commerce against really incommensurate public benefits. That seems to be very difficult to do on a 12B6 motion, but I haven't seen anything here that would lead me to reconsider likelihood of success on the merits enough to say that we ought to reimpose an injunction, while you've carried out what could be very expensive discovery and potential hearings on the merits. But that's what concerns me. We don't – I understand that concern. However, I think, you know, we're asking you to invalidate the law, and the alternative, we're asking – There's no way, frankly, that I would invalidate the law by reversing the grant of a motion to dismiss, okay? It's not facially discriminatory. It doesn't try to regulate beyond Chicago's territory. The only way you could have a case is by this kind of pike balancing test, it seems to me, which, as I've written before, that I think it's mushy, it's messy, it's not clear to me. Well, the Supreme Court does embrace it from time to time, okay? That's your best hope. But that's a very expensive and dicey proposition. We weren't able to have any evidentiary hearings. We weren't able to produce any relevant documents or have depositions of expert testimony. That would have been required to balance the interests of the city vis-à-vis the interests of Interstate Congress. And that's why we find that the motion to dismiss was incorrectly or should not have been granted. Could I ask you, at page 19 of your brief, you say, The district court held that plaintiffs must allege that the challenged law is inconsistent with the legitimate regulatory regimes of other states or that any sort of interstate regulatory gridlock would occur if many or every state adopted similar legislation. When you cite page A18, I was looking for page A18. Did I miss that? I get I'd have to provide an answer. Your appendix ends with A14. It sounds like that may have been an error. The government in Chicago has suggested that you basically just cut and pasted two different briefs in two different cases and have gotten them mixed up. We were closely with other law firms before this case even started, to the extent that we didn't edit some things. This is a basic citation to a quotation from the district court purportedly. And it's not there. Did anybody check this brief? Yes. Did you? I did. And did you check that one? Apparently we were in error on that citation. It's not the only one. The city's brief has pointed out a number of them. For example, the district court seemed not to comment on the evidence that you've offered in your pleadings of discriminatory intent. Well, the district judge here did. So, again, what happened? Again, I'd have to respond to that. If I could continue. Are there any licensed readers in the city of Chicago? I'm sorry, could you repeat that? Are there actually any licensed readers in the city of Chicago? I believe there are. I know there are breeders in the city of Chicago. I don't know if they have licenses or not. There's many breeders in the city. They would be benefited by this law. Yes, but, you know, as I said, my question is licensed readers. I believe there is. I do not know for sure. Yeah. Is there anything that would stop a pet shop from selling a shelter animal for more money than the city currently does? For example, if it got an abandoned purebred toy poodle from the Humane Society, can it sell that dog for the market rate that a breeder might charge? No, they can't. The market is completely different for abandoned dogs, for adopted dogs, than it is for purebred dogs that people seek out for a special purpose that are young. Yeah, but I ask you if it gets an abandoned purebred toy poodle from somewhere, can it sell that dog for the market? Typically, it's not the same price. And how do we know that? That's something that is on the record, that has been established in an affidavit in the district court. Sorry, what? That was filed as an affidavit in the district court. But from my knowledge of the market, that the market for abandoned or adopted dogs, the prices are much less no matter if it's purebred or newborn. All right. Thank you, Mr. Patrick. Thank you. Mr. Byron. Good morning, and may it please the court, hopefully you can see me, Judge Rovner. Oh, I can. You look great. Oh, well, thank you. You all look great. Judicial notice of that is very appreciated. This court should affirm the judgment of the district court for a number of reasons. In my discussion today, I'll focus primarily on the Dormant Commerce Clause issue. We'll rest on our brief regarding the Illinois Home Rule provisions, unless this court has any questions, of course. First, just to correct a repeated misrepresentation regarding the scope of the city's puppy mill ordinance. Park Pet Shop repeatedly alleges that the ordinance does not apply to breeders. That is incorrect. The ordinance applies to all licensed retailers within the city of Chicago, and the way the ordinance defines those is that anything that's licensed under the animal care provisions of the Chicago Municipal Code is covered whenever they sell a pet. Animal care facilities require licenses, and breeders are considered animal care facilities for purposes of the animal care provisions. That's section 4-384-010. So does this essentially shut down large-scale breeding operations in the city? Yes. Yes, it applies equally to breeders, pet stores, and pet stores alike. It's explicit on its face that breeders are covered under this ordinance if they attempt to sell pets. There's no loophole as Park Pet Shop tries to present things. Well, there is an exception for small breeders. Could the city prohibit the sale of all animals other than rescue animals in any way at a breeders' facility, by courier, via Internet, within the city limits? Within city limits. The Internet comment, I'm not, that aspect of that, I'm not sure if that would, if it was Internet sales outside the city, I believe that might raise Dormant Commerce Clause issues, prohibiting people from out of state to sell. But if it were solely located within the city limits, I believe that would pass Dormant Commerce Clause muster, because it would not prevent, obviously would not explicitly discriminate against out-of-state entities. It wouldn't benefit local entities over out-of-state entities. Those local entities would actually be at a disadvantage to people outside the city that weren't subject to the city's regulation. And again, because the city has limited territorial jurisdiction, there's obvious limits to where it can regulate. As a matter of basic Illinois municipal law, we can't regulate the suburbs, for instance. We can't regulate external Cook County. It's just not within the city's power in the first instance. But suppose all of the surrounding municipalities also pass the same ordinance. Does, would it change the way we look at the impact of the ordinance? In other words, if Oak Park is the final one of, say, 20 Chicago adjacent or nearby municipalities to pass the ordinance, does its balancing look different than it would be for the first municipality to pass this? I'm not familiar with any cases that are on that subject, and it would seem somewhat unusual, but it also makes sense if the balancing would change. If something's illegal everywhere, for instance, certain designer drugs or something of that sort, it would seem like it'd be much harder to argue that there was a negative effect because of a particular ordinance when it's illegal. Wherever you go, everybody's kind of on the same level. I don't think that the constitutionality would turn on it. I think it would make the constitutional defense a lot easier to present, but I don't think it would be a requirement. I don't think it makes it more invalid. I think it just really makes it a harder effort on part of a plaintiff challenging in that circumstance. They'd have to allege where they could go that is being disadvantaged by some sense, and that just seems really hard in the hypothetical you present. And another thing, you know, on page 15 of your brief, surely you don't mean to contend that the ordinance will not have any economic effect on out-of-state breeders and in-state pet shops, do you? Because I wonder if you could walk us through how a breeder in Missouri can, quote, and this is a quote from page 15, continue to operate exactly as it did before the ordinance was enacted. The point there was, I'm sorry for the use of effect is obviously tricky in this context. It was meant to be discriminatory effect, you know, some sort of discriminatory change in things, that mere effects are not troublesome under the Commerce Clause. That was this court pointed that out in National Paint, that just everything that a mere effect any government does is going to have some sort of effect. So I apologize for any lack of clarity there. The point was discriminatory effect. Turning to the second part of your question, the point there is that these out-of-state breeders, there's no extraterritorial effect, for instance. They don't have to change how they operate. They don't have to impose new safety controls. They don't have to impose new housing requirements or anything of that sort. And to the extent they desire to sell, there's no impediment to that. There's nothing to stop them from selling. There might be a change of incentives that they don't have a pet store to go to, but there's nothing that keeps them, there's nothing that puts that barrier up in the stream of commerce that the Dormant Commerce Clause is concerned with. There's nothing to stop them from selling. It's not like the truck regulations that keep people from going through, keep trucks from going through a certain state rather than another or taxing out-of-state entities differently. They can still sell if they want to sell on the Internet, for instance. They're perfectly capable of doing that. There's nothing that's been changed there. It's the pet stores, it's the local entities that can no longer serve as the intermediary. But the pet stores can still sell to a local consumer the same way they could sell to a local pet store previously. A buyer would have to either go visit the breeder if they want to see the pet face-to-face. Maybe they could Skype with the puppy. I don't know, but you basically have to realign the channels of distribution, right? It changes how that works. I agree. Let me, if I could, quote the late Justice Scalia. Okay? This is where I run into trouble in this case. In his concurring opinion in CTS against Dynamics Corporation of America, he wrote, one commentator has suggested that at least much of the time we do not, in fact, mean what we say when we declare that statutes which neither discriminate against commerce, and this one doesn't, nor present a threat of multiple and inconsistent burdens, this one doesn't, might nonetheless be unconstitutional under a balancing test. And he cites an opinion by a scholar named Regan. If he is not correct, he ought to be. In essence, Justice Scalia was arguing for avoiding the balancing tests under the Dormant Commerce Clause. And that's a strong argument. The problem I have is it's not an argument that the entire Supreme Court has adopted yet. And how do we decide or apply those sorts of balancing tests on a 12b-6 motion? Well, on a 12b-6 motion, it comes down to the standards set out in Twombly and Iqbal and those sorts of cases regarding pleading standards. It's just whether facts have been pled that plausibly show that the, in this case, the Pike balancing plausibly comes out in Park Pett's favor. And as the Supreme Court has noted, Pike balancing isn't an easy test. And I think this Court's opinion in National Paint reflected that if it were treated as some seem to treat it, and I believe Justice Scalia was kind of railing against the kind of Lochner Part II sort of interpretation of the Pike, that it has to be clearly excessive. I believe this Court phrased in National Paint that people of disinterested people, I'm paraphrasing of course, disinterested people looking at the law and looking at the effects, couldn't say that there were benefits in the, when everything's, when you pop everything on both sides of the scale. And here, Park Pett hasn't made any effort to show. They don't even address the city's interests in this in the first place. They don't address the city's serious financial expenditures that are resulting from the unfortunate fact that pets aren't being adopted. They're being, and the fact that these local consumers are being harmed by getting from these pet stores, pets that they don't know, because they're getting from pet stores, they don't know their origin. They don't know how they were raised. And years after the fact, they're finding out this pet has a congenital defect. So what, well, the city's financial interest here looks like it's on the order of several hundred thousand dollars a year. Is that about right? It's approximately 500,000. The numbers are a little bit fuzzy in the way they're written. It's hard to put a precise number on that. That's the order of magnitude. Right. But what if the evidence showed that tens of millions of dollars in commerce were being cut off as a result? Well, the question there would be whether that is a result of a discriminatory effect. It's not just effects. There could be effects, and I want to make clear we're not disputing that there are, again, any law. Presumably you want it to have effects, right? It would be silly if it didn't, I think. And I totally get what you're saying about discriminatory effects, but I'm also looking at cases like Hunt against Washington, Apple Commission, Pike itself, our decision in government suppliers versus buy, where the courts have said, in essence, even without discriminatory effects, we get into this balancing test, and even if it's not easy to satisfy, I don't know, I'm just struggling with how we try to resolve that on a 12v6 motion. Well, I don't think that the Pike is triggered when there aren't discriminatory effects. I think it's a different magnitude of discriminatory effects, and I think that's the key part here. For example, in Hunt, those Apple regulations that were being imposed were having a discriminatory effect because, as I understand the law, it was creating, the Washington Apples had a higher, they had above the highest level that other places had. They had levels that went up above that, and the other states were taking that away. They were taking away an incentive for out-of-states to impose higher regulations, higher standards, and that was a very, you know, it wasn't necessarily a strong discriminatory effect, but it was still a discriminatory effect. It was specifically targeting a particular market and impeding that market's ability, that particular state's market's ability to compete, and I think that's when Pike is triggered. Here, there's just no discriminatory effect at all. What out-of-state breeders can't do, local breeders can't do. There's nothing in the ordinance that makes anything regarding location relevant whatsoever, and while there are effects, it's imposed. But there is an economic impact on out-of-state breeders. They have to find a way to sell their puppies other than in pet shops, and pet shops might suffer from their inability to sell purebred breeder puppies, but, you know, there are other things to think about. Well, and again, we don't dispute that there are effects. The ordinance was designed to have effects. It was designed to have effects, but that isn't the triggering of Pike. When this court was setting out the four tiers and the unfortunately mushy tier of the Pike balancing level, it didn't say that mere effects were enough to trigger Pike. I mean, were not enough to trigger Pike. In fact, in National Paint, if mere effects had been enough to trigger Pike balancing, then this court's decision is hard to reconcile with itself, because in National Paint, the city outright barred the sale of certain goods. That necessarily pushed those goods out of the city into the suburbs and had an effect to whatever places in the country were distributing those goods into the city. Whatever company was selling paint, you know, if it was in Missouri, if it was in Alabama, wherever, would have been affected, but it wasn't discriminatory. It didn't give that person a disadvantage merely because they were out-of-state, and it didn't reallocate that advantage to someone in the city. No one in the city could sell paint to the local stores. So I think that's really the crux here of the Pike balancing analysis, that there are effects. Every law is going to have effects, but they're not discriminatory. They're not, it's not putting the thumb on the scale in the favor of city businesses. I see my time is up. If this court has no further questions, we respectfully request. If I could just ask one quick question. The market participant defense that you've raised, was that presented to the district court? That was not, but as an issue of law, I believe that can probably be considered in the motion to dismiss. It doesn't depend on any facts, like the extent of the government's participation? No, no, it does not. And to the extent that this court has any questions about the city's participation, those are judicially noticeable facts. It's public record that the city participates in the market for pets through its commission on animal care and control. These are recognizable facts. There's no reasonable dispute that the city engages in that activity, so that's properly considered here. Thank you. All right, thank you. Mr. Patrick, your time had expired, but you may have two minutes to rebut. If there's anything further you'd like to say. Thank you, Your Honor. I believe I requested five minutes for a rebut. Right, but your time expired. You ran through it all. Oh, understood. Thank you very much. First, I'd like to say that I understand why the city is doing this, but they're taking two contradictory positions at the same time. They're saying they're trying to pass a bill to stop puppy mills from outside the city and trying to say at the same time we're not affecting breeders outside the city from doing business here. They can't have it both ways, and they're trying to have it both ways at the same time. Second, this case is distinguishable from national paint in one critical way, and that is in national paints, all spray paint that's being sold in the city was not allowed. If you produced spray paint, you couldn't sell it. If you retailed spray paint, you could not sell it. In this case, if you retailed a purebred puppy, you could not sell that. However, if you produced a purebred puppy, you could sell it in this case. If you're a breeder, you can still sell dogs within the city of Chicago, and you can apply that to every case that the city tries to show as evidence that they're not discriminatory, that doesn't put a burden on interstate commerce, and that shouldn't be invalidated. Just put on the end of it, what if there was a local interest that was protected? And it says so in its own ordinance. It says in the whereabouts section, but it says we're not touching breeders. We're not touching local. And they don't say local, but the effect is because foreign breeders are— the relationship between breeders and the retailers is so complementary, it's the vast majority of their sales. Without the retailers, they can't do business. They effectively cannot do business in the way they used to do within the city of Chicago. They can use the Internet, that's sure, but I don't know if the Internet's a great substitute for face-to-face contact by purchasing a pet. All right, thank you. Thank you. Our thanks to both counsel. The case is taken under advisement.